Steven Ray MILLIGAN *v.* WEST TREE SERVICE et al.

CA 96-789 946 S.W.2d 697

Court of Appeals of Arkansas
Division IV
Opinion delivered April 2, 1997

[Supplemental opinion on partial granting of rehearing
delivered June 4, 1997.]

*David J. Potter*, for appellant.

*Huckabay, Munson, Rowlett & Tilley, P.A.*, by: *Jim Tilley* and *Julia L. Busfield*, for appellees/cross-appellants.

SAM BIRD, Judge. Steven Ray Milligan, the claimant, appeals from a decision of the Workers' Compensation Commission that found he was not entitled to any additional temporary total disability. West Tree Service has appealed the Commission's finding that approved a change of appellant's physician to the Hand Surgery Centres of Texas in Houston, Texas.

Appellant testified that he had dropped out of school in the tenth grade and started working for Texarkana Mack Trucks in Texarkana, Texas, cleaning the shop, carrying garbage, and going after parts; he then worked for Tyson Foods in Oklahoma processing poultry; he also worked for Barksdale Lumber Company in Amity, Arkansas, making fencing and posts; he went back to work for Tyson Foods; and then he began working for West Tree Service.

On June 19, 1990, appellant was in his early twenties and was working for West Tree Service. He was up in a bucket truck trimming trees around power lines with a chain saw when his right hand swelled up "real big." He was taken to the emergency room by his supervisor and was diagnosed by Dr. Samuel Peebles as having tendinitis. He missed two or three days of work, then returned and worked until February 14, 1991, when his wrist mobility, swelling, and pain forced him to quit.

Dr. Peebles then referred appellant to Dr. Lloyd Mercer of Hope, an orthopedic surgeon. Dr. Mercer referred him to Dr. Marsha L. Hixson, a Little Rock hand specialist, who recommended surgery in the form of a radial shortening osteotomy. After several months of conservative treatment during which his hand condition deteriorated, appellant finally agreed to the surgery, and it was performed in May 1992. Appellant testified that he had wanted to get a second doctor's opinion before submitting to the surgery but the employer's insurance carrier, U.S. Fidelity and Guaranty Company, refused to authorize it, and appellant could not pay for it himself.

Dr. Hixson, testifying by deposition, explained that appellant's injury was to the lunate bone, a half-moon-shaped bone located where the forearm meets the wrist that allows the wrist to swivel. X-rays and other tests revealed that the lunate bone in appellant's right wrist was fragmented and partially collapsed. Dr. Hixson said appellant's condition is known as "Keinbock's Disease," vascular necrosis of the lunate, and it is very rare. She described the surgery she performed as breaking the radius bone in the arm, shortening it, and thereby taking the pressure off the lunate. Dr. Hixson testified that after several months of recovery from the surgery, appellant still had a stiff, painful wrist, decreased sensation in his palm, and a stiff forearm in which he had lost some motion. She said appellant thought he was better off before the surgery than he was afterward. She last saw appellant on November 13, 1992, and assessed a twenty-seven percent loss of the right upper extremity.

Appellant testified that his wrist never got well enough to use and that he had filed a malpractice claim against Dr. Hixson. He said he had been examined by Dr. Michael G. Brown and Dr. Brent Keyser of the Hand Surgery Centres of Texas and was told that the lunate bone in his right wrist was crushed, fragmented, and dead. Dr. Brown recommended surgery during which he would remove the diseased lunate bone and replace it with a soft tissue allograft, repair the damaged nerve, and remove the nonabsorbable sutures that had been left in his hand after the previous surgery. Appellant said the sutures go from the bottom part of his thumb through the fatty part of the thumb three and one-half or

four inches, and that anytime he tries to pick up something with his right hand, the sutures feel like "little needles sticking, and sometimes it gets to itching like it's on fire, but I cannot [scratch] it, because I can't stand to touch it. It hurts when you touch it."

Appellant testified that he could no longer do any of the jobs he had previously held because they all involve lifting, pushing, and pulling with both hands, and he cannot do anything that might cause vibration in the right wrist because it could disrupt the precarious blood supply to the lunate. Consequently, appellant has not looked for work since February 14, 1991.

The opinion of the administrative law judge, which was affirmed and adopted by the Commission, states that initially appellee, through its insurance carrier USF&G, agreed to the surgery recommended by Dr. Brown, but subsequently withdrew its approval, citing Ark. Code Ann. § 11-9-102(17) (1987) and the definition of "medical services" contained therein as services performed by any practitioner licensed under the State of Arkansas relating to the healing arts. The record reveals that appellee did not object to the surgery itself; rather, it objected to appellant utilizing physicians from out of state.

The opinion also states that following the initial hearing in this case, an opinion was entered changing appellant's treating physician to a Dr. R. Cole Goodman of Fort Smith. However, Dr. Goodman refused to treat appellant and the law judge withdrew that opinion. The opinion from which this appeal arises says that appellant had speculated that because the community of hand specialists in Arkansas is so small, none of its members will willingly treat a patient who is pursuing a malpractice action against another member of the group. The judge said, "Dr. Goodman's withdrawal of his services is consistent with the claimant's theory," and that it was unlikely that appellant would receive appropriate medical care locally. Consequently, the law judge approved a change of physicians for appellant to the Hand Surgery Centres of Texas.

Appellant described his condition at the time of the hearing:

[T]he lunate bone is collapsed and disintegrated into my hand and — or into the end of my forearm where it meets my hand,

and the rest of my hand has been sliding down, you know, over the top of that. I've got that problem that I've had since — since February 14, 1991, in addition to the problem that I've had since May 13th of '92, which I had the radial shortened. I can't turn my forearm all the way, because of the radius and ulnar joint are - well, my radius is shorter, and now it is in a bind. My forearm rotation is in a bind. . . . And I've still got the pain of the collapsed bone. It's like my hand is, from the inside out, crushed like, so to speak, and any movement that you move it, it hurts. You know, it's a crushed joint. Anything I pick up that is very heavy or anything, or even sometimes, if the weather does just right, it swells up, and it hurts. . . . [A]lso, I have pain that runs all the way up that is slanted this a way (witness indicating), up to my elbow.

Q. Indicating from the inside of your arm to the outside of your arm across the top of the elbow?

A. [A]nd any movements whatsoever sets that off.

The administrative law judge found appellant to be entitled to temporary total disability benefits from February 14, 1991, through January 21, 1992, and again from May 13, 1992, through November 13, 1992, during the time he was recuperating from surgery. In January 1992, Dr. Hixson reported that if appellant refused to have the radial shortening procedure done, he had reached maximum medical benefit. The law judge held, "There is no indication that the claimant has yet entered another healing period and has also become incapacitated to earn wages, so that he would be entitled to additional temporary total disability benefits."

■■■ Temporary total disability benefits cannot be awarded after a claimant's healing period has ended. *Elk Roofing Co. v. Pinson*, 22 Ark. App. 191, 737 S.W.2d 661 (1987). A claimant's healing period ends when the underlying condition causing the disability has become stable and if nothing further in the way of treatment will improve the condition. *Id.* The healing period has not ended so long as treatment is administered for healing and alleviation of the condition and continues until the employee is as far restored as the *permanent character* of the injury will permit. *Arkansas Highway & Transp. Dep't v. McWilliams*, 41 Ark. App. 1,

846 S.W.2d 670 (1993) (emphasis added). The determination of when the healing period ends is a factual determination to be made by the Commission. *Thurman v. Clarke Indus., Inc.*, 45 Ark. App. 87, 872 S.W.2d 418 (1994). The court of appeals must uphold such factual findings unless there is no substantial evidence to support them. *Arkansas Highway & Transp. Dep't v. McWilliams, supra.*

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and we do not reverse a decision of the Commission unless we are convinced that fair-minded persons with the same facts before them could not have arrived at the conclusion reached. *Willmon v. Allen Canning Co.*, 38 Ark. App. 105, 828 S.W.2d 868 (1992). While these rules provide for some degree of insulation of the Commission from judicial review, this insulation cannot be absolute or else this court's function in reviewing these cases would be rendered meaningless. *Arkansas State Police v. Davis*, 45 Ark. App. 40, 870 S.W.2d 408 (1994); *Boyd v. General Indus.*, 22 Ark. App. 103, 733 S.W.2d 750(1987).

In making its decision that appellant's healing period had ended on November 13, 1992, the law judge relied upon Dr. Hixson's statement that she had last seen appellant on November 13, 1992, and felt that he had healed from the radial shortening osteotomy. The Commission apparently failed to discover that in her deposition, taken on February 2, 1993, Dr. Hixson said appellant's healing period from the surgery probably ended around November 13, 1992, but that:

> He was still having some decreased sensation in the palm and he thought that his wrist was still stiff and painful. . . . I thought that he had healed from — I mean, he had healed from the bone and the osteotomy. It generally takes, oh, between sometimes up to a year-and-a-half to heal, I mean to say that things have settled down after that particular operation. So he had healed the soft tissues and the bone, *but I don't think he had fully recovered from surgery at that time*, but he was doing about as expected. I didn't expect any great improvements for a while. (Emphasis added.)

On January 4, 1993, Dr. Hixson wrote to the insurance carrier:

> His [appellant's] limitations at this time are unchanged in that he cannot lift, push or pull more than 10 to 15 pounds using the right wrist, and he is unable to use the wrist in a repetitive fashion. His last measurements indicated a mild loss of motion of the wrist and forearm and a loss of grip strength in the right hand measuring 30 kg on the right versus 55 kg on the left. Based on mild wrist synovitis and loss of forearm and wrist motion, I have calculated a 27% loss of the right upper extremity. At this point, Mr. Milligan is unable to perform his former job due to loss of motion, loss of strength, and pain.

In her deposition Dr. Hixson said, "There is a possibility that over the next six months, he might improve some relative to his distal radial ulnar joint pain, but that wasn't going to affect anything that I had — any restrictions or impairment rating. *So I can't say that he had actually reached maximum medical improvement.*" (Emphasis added.)

In a letter dated June 8, 1993, Dr. Edward R. Weber wrote:

> Mr. Milligan was seen by me on 1/27/93. The diagnosis of Kienbock's disease was confirmed. He had undergone a radial shortening osteoplasty. It usually takes one to two *years* for the navicular to revascularize after such a procedure. Symptoms after that period of time should decrease. I would advise this patient to wait for the healing period to be completed which should be approximately another nine to twelve months. No further surgical intervention is indicated until that time. (Emphasis added.)

Appellee argues that the decision is supported by substantial evidence and emphasizes other evidence in the record.

It appears that since the day his injury incapacitated him in February 1991, appellant has been unable to work, has lost the use of his right hand, has had one unsuccessful surgery and needed another.

We agree with the Commission that appellant was not entitled to temporary total disability because between January 21 and May 13, 1992, according to Dr. Hixson, appellant had reached maximum medical benefit unless he decided to have the recommended surgery. The Commission's decision regarding that time period is affirmed.

However, when we consider the evidence before the Commission we cannot find substantial evidence to support the finding that appellant's healing period ended on November 13, 1992. Dr. Hixson, in a letter dated January 4, 1993, to the insurance adjuster, wrote that "Steve Milligan was last examined here at UAMS on 11/13/92. At that point, I felt that he had healed from the radial shortening osteotomy." She also said in the same letter:

> He was still having problems with the wrist in terms of loss of motion and wrist pain. . . . his limitations at this time are unchanged in that he cannot lift, push or pull more than 10 to 15 pounds using the right wrist, and he is unable to use the wrist in a repetitive fashion. . . . At this point, Mr. Milligan is unable to perform his former job due to loss of motion, loss of strength, and pain.

On February 2, 1993, Dr. Hixson testified by deposition that as of November 13, 1992, appellant's soft tissue and bone had healed but he had not fully recovered from surgery; it sometimes takes a year and one-half to heal; he had not reached maximum medical improvement; his before and after x-rays showed no improvement; and "Milligan has not reached his maximum medical improvement at this point."

In an April 19, 1993, letter, Dr. Brent Keyser of Hand Surgery Centres of Texas, said that appellant has at least a stage III Kienbock's disease; "Comparison of serial x rays from 11-8-91 to 1-20-93 show [sic] progressive collapse and fragmentation of the lunate. . . . Since he has worsening of his pain and progression of the radiologic picture I have recommended that he have a second surgical procedure in order to alleviate his symptoms."

On June 8, 1993, Dr. Edward R. Weber, of the Arkansas Hand and Microsurgery Center, wrote, "It usually takes *one to two years* for the navicular to revascularize after such a procedure [a radial shortening osteoplasty]." On July 19, 1993, Dr. Hixson wrote of the surgery Dr. Brown had recommended. "The proposed second surgery is an attempt to resolve a work-related injury. This is the same problem for which Mr. Milligan has already received treatment from myself and from Dr. Ed Weber.

The surgery sounds reasonable and is aimed towards resolution of Mr. Milligan's more severe problems."

On February 28, 1994, Dr. Brown wrote:

> Radiographs revealed a Stage IV Kienbock's with collapse of the lunate and perilunar arthrosis. . . . This patient had the radial shortening performed for State IV Kienbock's and that is inappropriate. Radial shortening, a joint leveling procedure, is used in early (Stage I) Kienbock's to unload the lunate and preserve the lunate. When the patient had this procedure performed, the lunate had already collapsed and the procedure was doomed to failure. . . . Clearly, the patient needs excision of the lunate and I would replace the lunate with allograft fascia lata. In addition, I would remove the foreign bodies [nonabsorbing sutures left in during the radial shortening surgery] and perform neurolysis of the volar cutaneous branch of the radial nerve in hopes of achieving some relief in that region as well. Should this patient's condition go untreated long enough then he will have complete arthrosis of the entire wrist necessitating total wrist fusion and this would result in a considerate impairment as opposed to performing the lunate excision and arthroplasty and preserving some wrist motion.

On March 3, 1994, Dr. Brown wrote to the appellant, "It is imperative that you have treatment before you have complete degeneration of the wrist."

■ With this evidence before it, we cannot understand how the Commission could have held that appellant's healing period ended November 13, 1992. Consequently, we reverse the Commission's finding that appellant's healing period ended on November 13, 1992. It is clear that at the time the record was closed appellant was still in a healing period. We hold that appellant has remained in his healing period from May 13, 1992, through the entire period covered by the record, which ends on April 2, 1996, and to a date yet to be determined.

■ We remand to the Commission to take additional evidence regarding appellant's surgery in Houston, his recovery period, and up-to-date medical records to determine his current status.

■ Appellant also argues that we should provide for attorney's fees on the entire claim of temporary total disability pursuant to Ark. Code Ann. § 11-9-715 (1987), because the entire claim was controverted. We agree and remand to the Commission to award appellant's attorney the appropriate fee.

■ Appellant also argues that we should assess a penalty against appellee for refusal to pay rightfully due benefits on time pursuant to Ark. Code Ann. § 11-9-802(b) (1987). We agree that the actions of the employer and the insurance carrier have been egregious and remand for the Commission to consider assessing a penalty.

Appellee argues in its cross-appeal that the Commission erred in interpreting Ark. Code Ann. § 11-9-102(17) (1987) to mean that appellant could receive treatment from an out-of-state physician. At the time of appellant's injury, the statute read, "'Medical services' means services performed by any practitioner licensed under the laws of the State of Arkansas relating to the healing arts." Although cross-appellant conceded in its oral argument that this definition should not be so narrowly applied as to prohibit a claimant from ever being treated by an out-of-state physician, it contended that a claimant could seek the services of an out-of-state physician only after he or she had shown that there were no medical-service providers licensed in Arkansas that could provide the treatment that claimant required. We do not agree. If, as cross-appellant concedes, section 11-9-102(17) does not prohibit treatment by out-of-state medical-service providers, there is no language in the statute which places on a claimant the burden of first proving that there are no physicians licensed in Arkansas who can provide the necessary treatment. We think a more logical meaning of section 11-9-102(17) is that a claimant may receive compensation only for treatment that is provided by the community of medical-service providers whose discipline is regulated in the State of Arkansas through its licensing procedures. This would exclude compensation for the cost of services charged, for example, by faith healers, psychic healers, or any other purported practitioners of the healing arts that might be recognized in other states but which are not regulated or licensed in Arkansas.

■ The Commission's order allowing appellant a change of physicians to the Hand Surgery Centres of Texas in Houston, Texas, is affirmed.

Affirmed in part and reversed in part on direct appeal, affirmed on cross-appeal, and remanded with directions to the Commission.

ROBBINS, C.J., and COOPER, J., agree.

## SUPPLEMENTAL OPINION ON PARTIAL GRANTING OF REHEARING

946 S.W.2d 697

June 4, 1997

*David J. Potter*, for appellant.

*Huckabay, Munson, Rowlett & Tilley, P.A.*, by: *Jim Tilley* and *Julia L. Busfield*, for appellees/cross-appellants.

SAM BIRD, Judge. West Tree Service and U.S. Fidelity & Guaranty Co. have filed a petition for rehearing alleging three errors in this court's opinion of April 2, 1997. Because we agree with one of appellees' arguments, we issue this supplemental opinion.

Appellees argue that our order suggesting that the Workers' Compensation Commission consider assessing a penalty against appellees was in error because the issue had not been raised to the Commission and because the statute cited, Ark. Code Ann. § 11-9-802(b) (1987), applies only to the failure to pay benefits that are due and not controverted. We agree, and we grant appellees' petition for rehearing as to this point and withdraw our directive that the Commission consider assessing a penalty against appellees.

However, we disagree with appellees' other assertions in the petition for rehearing. First, we disagree that we have reweighed the evidence in coming to the conclusion that there was not substantial evidence to support the Commission's finding that appellant's healing period ended on November 13, 1992.

The administrative law judge, whose opinion was adopted by the Commission, found that appellant had continued in his healing period until November 13, 1992. The only evidence upon which this finding could be based was the letter of Dr. Marcia Hixon to appellee U.S.F.&G. dated January 4, 1993, in which she opined that the appellant had healed from the radial shortening osteotomy as of November 13, 1992. In a letter from U.S.F.&G. to appellant's attorney dated January 11, 1993, U.S.F.&G. apparently interpreted Dr. Hixon's letter to mean that appellant's maximum medical healing had ended on

November 13, 1992. However, in her deposition on February 2, 1993, Dr. Hixon stated that when she examined appellant on November 13, 1992, appellant "had healed from the bone and osteotomy. It generally takes between sometimes up to a year and a half to heal. I mean to say that things have settled down after the particular operation. So he had healed the soft tissues and the bone, but I don't think he had fully recovered from the surgery at that time. . . ." Subsequently in her deposition, Dr. Hixon stated that she "cannot say that [appellant] had actually reached maximum medical improvement" as of November 13, 1992.

██ ██ We agree with the appellees that it is the function of the Commission to weigh the evidence, *Teague v. C & J Chemical Co.*, 55 Ark. App. 335, 935 S.W.2d 605 (1996), and we agree with the appellees that it is the limited function of the appellate court on review to determine if the Commission's findings are supported by substantial evidence, *Crawford v. Pace Indus.*, 55 Ark. App. 60, 929 S.W.2d 727 (1996). However, in determining whether substantial evidence exists to support a finding of the Commission, we are required to look at the evidence and make a determination of whether there is evidence that could have led fair-minded persons to reach the same result. *Hoskins v. Rogers Cold Storage*, 52 Ark. App. 219, 916 S.W.2d 136 (1996). Where, as here, the medical opinion upon which the Commission relied in making its finding is a doctor's statement that the same doctor subsequently refuted, we cannot agree with appellees that the Commission's finding is supported by substantial evidence.

Secondly, while standing firm in our affirmation of the Commission's decision to permit appellant to receive treatment from an out-of-state physician, we take this opportunity to explain further the basis for our decision and our interpretation of the definition of the term "medical services" as contained in Ark. Code Ann. § 11-9-102(17)(1987).

We wish to make it clear that our decision to affirm the Commission on cross-appeal was not based on the concession by appellees' counsel during oral argument. While we did, in our

opinion of April 2, 1997, make mention of the fact that appellees' counsel did concede that the definition of "medical services" as contained in Ark. Code Ann. § 11-9-102(17) "should not be so narrowly construed as to prohibit a claimant from ever being treated by an out-of-state physician," that conclusion can be reached in this case without appellees' concession by referring to other provisions of the Workers' Compensation Law.

■ For example, under Ark. Code Ann. § 11-9-401(a)(1) (1987), it is the responsibility of the employer to "secure compensation to his employees and pay or provide compensation for their disability or death from injury arising out of and in the course of employment without regard to fault as a cause of the injury." Further, Ark. Code Ann. § 11-9-514(a)(1)(1987) permits a claimant to change physicians upon a showing "to the satisfaction of the Commission that there is a compelling reason or circumstance justifying a change."

■ In the case at bar, the law judge apparently found justification for a change of physicians and found that the appellees had "preliminarily agreed" to the change and "did not necessarily oppose the surgical procedure requested" but opposed the use of physicians outside the State of Arkansas. Therefore, the law judge entered an opinion changing the appellant's physician to Dr. R. Cole Goodman of Fort Smith. However, Dr. Goodman refused to treat appellant and that opinion was withdrawn, resulting in a finding by the law judge, consistent with appellant's theory, that as a result of a pending medical malpractice suit by appellant against Dr. Hixon, appellant is unlikely to receive appropriate medical treatment from any hand specialist in Arkansas. As the law judge pointed out, if appellant is to receive the benefits of the employer's continuing statutory obligation to provide appropriate medical care, it is necessary that appellant be permitted treatment by out-of-state physicians. Clearly, it would violate an employer's statutory duty to provide medical care if that care was denied simply because there was no medical service provider in Arkansas who was qualified and willing to provide

the service. Although appellees argued that a sufficient showing had not been made by appellant to justify the Commission's authorization of a change of physicians, we hold that the Commission's decision in that regard is supported by substantial evidence.

 We agree with appellees that our interpretation of the term "medical services" as used in our opinion of April 2, 1997, was overly broad, and that interpretation is hereby withdrawn. However, we reach the same result using the analysis set forth above.

The petition for rehearing is granted in part and denied in part.

ROBBINS, C.J., and JENNINGS, NEAL, GRIFFEN, and CRABTREE, JJ., agree.